1

2

3

4                            UNITED STATES DISTRICT COURT

5                           NORTHERN DISTRICT OF CALIFORNIA

6

7    HENRY OLIVER,                             Case No.  15-cv-00397-JD

8                    Petitioner,

9           v.                                 **ORDER DENYING PETITION
                                               FOR WRIT OF HABEAS CORPUS
10   C.E. DUCART,                              AND DENYING CERTIFICATE
                                               OF APPEALABILITY**
11                   Respondent.

12

13          Henry Oliver, a pro se state prisoner, has brought a habeas petition pursuant to 28 U.S.C. §

14   2254.  The Court ordered respondent to show cause why the writ should not be granted.

15   Respondent filed an answer and a memorandum of points and authorities in support of it, and

16   lodged exhibits with the Court.  The petition is denied.

17                                      **BACKGROUND**

18          Oliver was found guilty by a jury of human trafficking and seven counts of committing

19   lewd acts on a child under 14 during a kidnapping.  Clerk's Transcript ("CT") at 539-67.  Oliver

20   had two prior prison terms and was sentenced to 33 years to life in state prison.  CT at 701-02,

21   722-25.  The California Court of Appeal affirmed the conviction and the California Supreme

22   Court denied a petition for review.  *People v. Oliver*, No. A132263, 2014 WL 1270308, at *1 (Cal.

23   Ct. App. March 28, 2014); Answer, Exs. 6, 8; *People v. Oliver*, S218296 (July 9, 2014)

24          The California Court of Appeal summarized the facts of the crime as follows:

25                  Jane Doe was born in 1997 and was fourteen-years-old and
                    attending seventh grade at the time she testified in this case.  Doe
26                  ran away from home for the first time in November 2009 because
                    she was upset that her father had walked out on her family, and
27                  because there was "nothing at home for [her]."  She described
                    herself as a "daddy's girl" who "needed [her] dad in [her] life" and
28                  testified, "I felt like if he can leave, then I can too."  She left home

United States District Court
Northern District of California

with $50 her mother had given her for a bus pass. She met a girl on International Boulevard in Oakland who said she made a lot of money as a prostitute. Because Doe needed money to survive, she decided to try working as a prostitute. She stayed with different people, including a man named Jay Rich (Rich), but did not give the money she earned to a pimp. She had various names, including Crystal, Luscious, Chocolate, and Tomarionna, and told people she was 19 years old.

Eventually, Doe was returned to her mother's home and was grounded for running away. On March 1, 2010, she ran away again. She saw Rich and "went with him" because she liked him. He bought her things, helped her out, and did not act violently towards her. On her first night, she stayed with him at a hotel. She had one "date" on her first day working as a prostitute with him and gave him $40 of the $60 she earned.

Doe first saw appellant-who she came to know by his nickname, Swift-on March 1, 2010 when she was working in Richmond on 23rd Street. Appellant was a passenger in a "[c]hampagne goldish" colored Lexus. The Lexus did not stop that day, but she saw it again the next day when she was working in the area of Stanford Street and San Pablo Avenue in the Berkeley, North Oakland, Emeryville area. Doe had just exited the car of a customer and was walking back to San Pablo Avenue when she saw the Lexus parked across the street. Appellant and his friend were there. Appellant got out of the car and started walking towards Doe, who felt scared because of the way he was looking at her, and because she could tell he was a pimp. Doe started to "circle the other way" and appellant walked towards her, then in front of her, to block her way. He said, "'Either you get in the car or me and my friend are going to chase you.'" She started to run but appellant grabbed her arm. She felt threatened and was afraid of being chased, so she got in the car. Appellant's friend was sitting in the front passenger seat.

They went to pick up another prostitute, "Busy," near Golden Gate Elementary School in Berkeley. They then drove to Telegraph Avenue and 55th Street to pick up another prostitute, "Lil Mama." From there they drove to a Motel 6 on the Embarcadero in Oakland and dropped off Busy and Lil Mama. While they were driving around, Doe had a brief telephone call with Rich and sent him three text messages to tell him she had been picked up by another pimp. She was scared and hoped that Rich would pick her up. Appellant soon took her cell phone from her.

Appellant took Doe to a music studio in downtown Oakland where she observed approximately ten to twenty men. Appellant told Doe she needed to make $300 for him if she wanted to leave the studio. Doe understood this to mean she had to perform acts of prostitution. Appellant then left Doe in the room with the other men. Doe felt sad and angry because she wanted to leave. She believed the other men were also pimps, and that her only choices were to earn the money for appellant or ask one of the other men to become her pimp.

Eventually appellant and his friend-who Doe later learned was

2

nicknamed Dame-took Doe back to the Lexus.  They picked up another girl, Apple Bottoms, and returned to Motel 6 in the late afternoon.  Appellant gave Doe some marijuana to smoke and cognac to drink.  After ingesting the drugs and alcohol Doe became more comfortable around appellant.  Appellant then directed Busy to take nude photographs of Doe to post on the internet, which Busy shot in the bathroom.  That night, appellant had vaginal sex with Doe while Dame, Busy, Lil Mama and Apple Bottoms were in the room, or in the bathroom.  Doe slept in the motel that evening.  When she awoke the next morning appellant and Apple Bottoms were gone, and Busy and Lil Mama were performing oral sex on Dame.  Dame threw a bottle cap at Doe and told her to join in orally copulating him.  She complied, then went back to sleep.

When appellant returned, Doe, Dame, Busy and Lil Mama got back in the Lexus and drove to Sacramento, where they stopped at the apartment of a girl named Slim and smoked marijuana.  They then drove to a motel, and appellant and Dame dropped off Doe, Busy, and Lil Mama and returned a little while later.  Busy was taken to a date while Doe and Lil Mama went to work walking Folsom Boulevard.  Doe had one date and gave the money to appellant.  The group spent two days in Sacramento with Doe working both days on Folsom Boulevard.  They then drove to a Motel 6 on Tully Road in San Jose.

When they arrived at Motel 6, appellant, Dame and Lil Mama left, and Doe had a date with a Mexican man she picked up on Tully Road.  After paying Doe, the man demanded his money back, and Busy pretended to call the police, but instead called Dame.  Appellant and Dame returned to the motel, beat up the Mexican man, and took his money.  The Mexican man went to a nearby police officer who responded to the room.  Police officer Anthony Torres, who was dispatched to the room at about 11:50 p.m., found three males-Caesar Rios, appellant and Damian Ferrara, or Dame-and three females.  The females said their names were Shanei Davis, Brandie Pinky-Jones and Tomarionna Johnson, and Tomarionna Johnson gave her date of birth as January 20, 1991, which would have made her nineteen years old at the time.  Doe testified that she gave the fake name and birth date because she did not want the officer to know she was a runaway, and did not want him to return her to her home.  Doe initially told appellant she was 19 years old because she believed if she told him her actual age he would leave her and she would not have anywhere to go.  At some later date, appellant again asked Doe her age and she told him she was 17.  Torres ran a warrant check and arrested appellant.  The rest of the group returned to Oakland and stayed overnight at Dame's sister's house in East Oakland.

In the morning, Dame brought appellant back.  Appellant told Doe to go to International Boulevard, and she and Lil Mama and Busy went there to prostitute.  Doe was not certain how many days she stayed in Oakland.  The group returned to Sacramento and stayed there for two days.  She worked on Stockton Boulevard with Lil Mama and Busy.  Doe believed she had three dates while working on Stockton Boulevard.  Appellant never told Doe how much to charge for a date.  She always gave the money to appellant because

she feared appellant would beat her.  Busy told Doe that Dame had twice broken her cell phone and had also broken her laptop.  Doe trusted Busy and Lil Mama because they were older and had befriended her.  While the relationship Dame had with Busy and Lil Mama was not clear, Doe considered only appellant to be her pimp, not Dame.

From Sacramento, the group traveled to Richmond.  They stayed at Dame's sister's house and Doe went to work on 23rd Street.  In Richmond, Doe had one date with a man named Manny who took Doe to his hotel for vaginal and oral sex.  She gave the money she received from Manny-which she believed was $150-to appellant, and they returned to Dame's sister's house.  The group spent the night in Richmond and returned to Oakland the next day.  Back in Oakland, Doe worked the street on International Boulevard and gave the money she received to appellant.  Appellant would drive by at times and would look at Doe as she worked the street.  He would sometimes stop his car, and she would hand him her money.

In addition to working the street, Doe also had dates that appellant "set [her] up on."  For example, on one occasion, appellant took Doe to a house in Berkeley.  Once inside, appellant spoke to a "dark-skinned," "older," "bald," man.  He told Doe, "You're going to date him," then left the house.  Doe understood that to mean that she was going to have sex with the man.  Doe and the man had vaginal sex, and she was at the house for "a long time."  "[W]hen the sex was done," appellant came back and spoke to the man, who told appellant that he wanted Doe to stay longer.  Doe therefore stayed longer and had vaginal sex with the man again.  Doe never received any money and did not see the man give any money to appellant.  Appellant returned to the man's house and told Doe to take a shower, which she did.

Appellant gave Doe a new cell phone so he could call or text her when she was working the streets.  She listed him in her contact by his nickname, Swift, but appellant changed the name to Bill so that if Doe were caught working, the police would not be able to identify him as her pimp.  Appellant took Doe to discount stores to buy her clothes, and he bought food for her.  He decided when and where Doe would work, and he paid for the hotels in which they stayed. He brought Doe to his mother's house on two occasions.  She had sex with appellant on almost all of the days she was with him, and she had oral sex with him "[e]very day and every night," once in the morning before she went to work, and once at night when she was done working for the day.  She did not feel she could decline when appellant wanted to have sex.  On one occasion, when she told him she was not in the mood to have sex, he replied in a demanding voice, "Well, you better get in the mood."  Doe believed appellant would beat her if she did not comply, so she would "just do it so I wouldn't get beat."  She also could not decline to work because she believed he would beat her if she did so.  On one occasion, while Doe was having vaginal sex with appellant, appellant forced his penis into her anus.  Doe tried to move away because she did not want him to do that, because she was surprised and scared, and because it was painful.  Appellant "said something" but she could not remember what he said, and she could not remember if appellant

4

hit her when she tried to move away.

Doe testified that she believed appellant would beat her if she refused to have sex with him because he had threatened her a couple of times, and because she heard appellant, Dame, Busy, and Lil Mama talking about how appellant beat "his other girl before [Doe]" by taking off his belt and "whacking at her" when she refused to go walk the streets because it was cold outside.   After appellant "whacked" the girl, she agreed to work and went back outside.   On one occasion, when Doe did something to make appellant angry, he pulled out his belt and she was afraid he was going to hit her with it.  Instead, he said, "You lucky you're cute and I like you," then walked out of the room.   Doe also knew that Dame had beat one of the girls when she did something to make him mad.   This made Doe surprised and a little frightened.   Doe testified that when she first got picked up by appellant, she was planning out in her head how she was going to escape.   When he took her phone, she felt she had no options and that she would not be able to escape because appellant would find her.

On or about March 17, 2010, appellant and Doe checked into the Motel 6 on Hegenberger Road in Oakland.   The next day, March 18, 2010, she had a feeling that "something was going to happen," so instead of working "outside," she stood in an alleyway near International Boulevard.   A man in a truck drove up and wanted a date, but he changed his mind when a police car went by.

Oakland police officers Hamann Nguyen and James Saleda were working undercover that afternoon in their assignment in the Child Exploitation Unit.   At about 4:20 p.m., Saleda observed Doe near the alleyway by International Boulevard.   He asked Doe how much she would charge for oral sex, and whether she had a room.   Doe told him it would be $40 for oral sex and pointed in the direction of her hotel.   Saleda called for back up officers to arrest Doe.   Doe heard police sirens and started to walk off, but police came down the alley and arrested her.   Nguyen suspected Doe was a juvenile, and confirmed that she was when he obtained her personal information.

Doe identified her pimp as Swift and said that his real name was Henry Lee Oliver.   The pimp's name was listed as Bill on the cell phone she had, which belonged to "her pimp."   Nguyen noticed while he was with Doe that she received as many as eight text messages and a phone call from Bill.   After Nguyen let the phone call ring through to voice mail, a text message from Bill came in asking, "Why aren't you answering your phone?"   Nguyen asked Doe to respond that she was busy with a "trick."   Bill replied, "Okay, babe, but when I text, text back."   Doe responded, "Okay, Daddy, I'm trying to get you this dough."   Bill replied, "Okay, but don't be so nice."

Doe told Nguyen that she had been forced into prostitution and wanted her pimp arrested "for forcing her to be out there."   Nguyen spoke to his supervisors and they decided to set up a plan to lure appellant out to arrest him for prostituting a juvenile.   Nguyen told Doe to call him back and tell him she had $200 from the john who had just left, and that there was another pimp in the area who was

following her and was trying to "take her."  Doe did as instructed, and Nguyen heard a male voice saying, "You have $200?" and Doe answering, "Yes."

Doe, as instructed, arranged for appellant to meet her at the Burger King at 14th Avenue and East 12th Street in Oakland.  Nguyen ran appellant's name in his computer and showed the photograph to Doe to confirm he was the person for whom they were waiting.  After a while a blue Pontiac with a female driver and male passenger slowly entered the parking lot.  When the vehicle passed the drive-through without stopping, the police stopped the car and appellant exited.  Appellant's cell phone was discovered during a search of the car.  Comparisons of the contact lists and call logs for Doe's cell phone and the cell phone found in the car in which appellant was a passenger confirmed that the calls exchanged after Doe's arrest were with appellant.

Saleda testified as an expert in "street trafficking, prostitution, pimping and child exploitation."  He explained that there are essentially two types of pimps.  A "guerilla pimp" drives around and "snatch[es]" a girl off the street and "uses fear of force to get a girl to work for [him]."  Often a guerilla pimp will take the girl to a "break house" to "break her down, have his friends have sex with her until she agrees to work for him."  The second type is the "Romeo pimp," who manipulates the girl with attention and love.  He tries to make his girls feel they are a part of his family and will sometimes give the girls marijuana and alcohol to make it easier for the girls to work.  Often, pimps will have a new girl work with other girls to create a "family type of atmosphere."  Both tactics of the guerilla pimp and the Romeo pimp are used to control the girls.  Saleda testified that approximately eighty-five percent of girls who were on the street were there because they had been sexually, physically, or emotionally abused, and were looking for "any type of attention."  Pimps avoided girls who appeared confident and targeted girls who had been sexually abused because they were "already numb" and "easy to break down."

Saleda testified that pimps take their girls to work "the circuit" around the Bay Area, moving the girls from city to city, including Oakland, San Jose, Sacramento, and Santa Rosa.  There are "tracks" in each city where pimps put the girls up in cheap motels near where they will be working, such as the Motel 6 on Tully Road in San Jose.  Pimps move the girls around because they know that if they are in one city too long, "the girls get known, the police may target them, or they may get a warrant in that city."  Pimps almost always give their girls a cell phone, which allows the girl to have customer contact, and allows the pimp to track the girl.

Saleda testified that pimps refer to what they do as "the game."  One rule of the game is that if a pimp is standing on the corner, a prostitute who is walking down the street must not look him in the eye and must walk around him.  If she breaks that rule, the pimp may consider her his, and will "take the girl regardless of whether or not she wants to go with him."  The new pimp then has the option of keeping her as his own, or "ransom[ing]" her back to her [old] pimp."  Another rule is that a prostitute must not keep any money, and will

United States District Court
Northern District of California

suffer consequences if she tries to do so. Saleda testified that the first rule of the game is "you don't give up your pimp." Pimps also direct their girls to list them in the cell phone contact list under a common first name so if the girl is arrested it will not be immediately apparent who her pimp is. When arrested, girls often do not give police their real names.

Saleda described Doe as "one of the most cooperative victims I dealt with in a long time." She did not take a long time or stall in answering questions. At the time of Doe's arrest, the police had been searching for her as a missing person at risk. They had been in contact with Doe's mother and knew she was looking for Doe.

*Oliver*, 2014 WL 1270308, at *1-5 (footnotes omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not

7

1   be overturned on factual grounds unless objectively unreasonable in light of the evidence

2   presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v.*

3   *Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). In conducting its analysis, the federal court must

4   presume the correctness of the state court's factual findings, and the petitioner bears the burden of

5   rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

6       The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

7   state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d

8   1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to

9   consider the petitioner's claims, the Court looks to the last reasoned opinion. *See Nunnemaker* at

10  801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

### DISCUSSION

12      As grounds for federal habeas relief, Oliver asserts that: (1) the trial court failed to sua

13  sponte issue a lesser-included-offense jury instruction; (2) there was insufficient evidence to find

14  a continuous aggravated kidnapping to support the lewd conduct counts; (3) the trial court failed to

15  properly instruct regarding the "continuing period of detention"; and (4) there was an improper

16  jury instruction regarding consent which diluted the burden of proof for the kidnapping counts.

17  **I.      LESSER INCLUDED OFFENSE**

18      Oliver asserts that the trial court erred by failing to sua sponte issue a jury instruction for

19  the lesser-included offense of committing a lewd act during a simple kidnapping, as opposed to an

20  aggravated kidnapping. But Oliver was not charged with aggravated kidnapping. He was charged

21  with committing a lewd act upon a child under the age of 14, and each count included an

22  enhancement for aggravated kidnapping because the kidnapping increased the risk of harm to the

23  victim. The kidnapping allegations enhanced the lewd act counts, and as a result the One Strike

24  sentencing law became applicable to Oliver.

25      **Legal Standard**

26      A challenge to a jury instruction solely as an error under state law does not state a claim

27  cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72

28  (1991). The failure of a state trial court to instruct on lesser-included offenses in a noncapital case

does not present a federal constitutional claim. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000). However, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." *Solis*, 219 F.3d at 929 (citing *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)). *Solis* suggests that there must be substantial evidence to warrant the instruction on the lesser-included offense. *See Solis*, 219 F.3d 929-30 (no duty to instruct on voluntary manslaughter as lesser-included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice).

Due process does not require that an instruction be given unless the evidence supports it. *See Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). A defendant is not entitled to have jury instructions raised on his or her precise terms when the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996). To obtain relief for the state court's refusal to give an instruction, the error must have so infected the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).

**Discussion**

The California Court of Appeal denied this claim.

> We review this issue de novo (*People v. Waidla* (2000) 22 Cal. 4th 690, 733), bearing in mind that an offense is a lesser included offense if "either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.)
>
> The offense of simple kidnapping (§ 207) is a lesser included offense of aggravated kidnapping (§ 209). Thus, an instruction on the lesser included offense would have been appropriate if appellant had been charged with aggravated kidnapping (§ 209). He was not. Rather, he was charged with 24 counts of committing a lewd act with a child under the age of fourteen, and for each such count, there was an enhancement allegation that he kidnapped the victim "and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk

United States District Court
Northern District of California

9

United States District Court
Northern District of California

necessarily inherent in the commission of that offense, within the meaning of . . . section 667.61(d)(2)."   The information further alleged that appellant was "punishable under the provisions of section 667.61(a). . . ."   In other words, the kidnapping allegations acted to bring each count of a lewd act with a child within the ambit of the One Strike sentencing law.

In *People v. Majors* (1998) 18 Cal. 4th 385, 410–411 (*Majors*), the California Supreme Court held that a trial court's obligation to instruct sua sponte on a lesser included offense does not extend to enhancements.   One of the primary reasons for requiring instructions on lesser included offenses is "'to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between [guilt] and innocence'''-that is, to eliminate "'the risk that the jury will convict . . . simply to avoid setting the defendant free.'"   (*Schad v. Arizona* (1991) 501 U.S. 624, 646–647.)   This risk is wholly absent with respect to enhancements, which a jury does not even consider unless it has already convicted defendant of the underlying substantive offenses.   (*See generally, People v. Wims* (1995) 10 Cal. 4th 293, 307["[A] sentence enhancement is not equivalent to a substantive offense, because a defendant is not at risk for punishment under an enhancement allegation until convicted of a related substantive offense. . . . At that time, a defendant's liberty interest 'has been substantially diminished by a guilty verdict.' [Citation.]   The Legislature, moreover, has in various ways expressed its intention that enhancements not be treated as substantive offenses."].)   Under these circumstances, we hold that a trial court's sua sponte obligation to instruct on lesser included offenses does not encompass an obligation to instruct on "lesser included enhancements."   (*Ibid.*)   Similarly, here, because the jury was asked to make the determination under section 667.61, subdivision (d)(2), only after it had found appellant guilty of the offense of lewd and lascivious conduct, there was no risk that it would be forced into an "all-or-nothing" choice.   (*See Schad v. Arizona*, *supra*, 501 U.S. at pp. 646–647.)

Appellant tries to distinguish *People v. Majors*, *supra*, 18 Cal.4th 385 by arguing that that case concerned a firearm enhancement, which "has no substance absent attachment to a principle [sic] term."   The case, however, did not limit its application of the rule regarding enhancements to situations in which the enhancement is unrelated to the principal term. Alternatively, appellant relies on the court's description of the One Strike Law as an alternative sentencing scheme in *People v. Mancebo* (2002) 27 Cal. 4th 735, 738, 741 (*Mancebo*), to argue that section 667.61 is not an enhancement, but that it simply "provides an 'alternative, harsher sentencing scheme' for those crimes that fall within its ambit."   The court in *Mancebo*, however, had no occasion to consider whether a sentence imposed upon a finding of an applicable circumstance under the One Strike Law was an

"enhancement," and certainly did not hold that the finding of
an enumerated circumstance under that law was equivalent
to an underlying substantive offense.  We conclude the court
had no sua sponte duty to instruct the jury regarding simple
kidnapping.

*Oliver*, 2014 WL 1270308, at *10-11.

The California Court of Appeal found that while simple kidnapping is a lesser-included offense of aggravated kidnapping, Oliver was convicted of committing lewd acts on a child with the enhancement that the child was under 14 and kidnapped.  Oliver was not charged with aggravated kidnapping, Cal. Penal Code section 209; therefore, the trial court had no duty to instruct on simple kidnapping as a lesser-included offense.  The California Court of Appeal also found no error for the failure to instruct sua sponte on a lesser-included enhancement which occurred in this case.  To the extent that Oliver asserts a violation of state law regarding the lesser-included offense or the One Strike sentencing law, he is not entitled to federal habeas relief.  Nor is federal habeas relief available for the failure to instruct on lesser-included offenses in a noncapital case.  *See* S*olis*, 219 F.3d at 929.

Oliver is entitled to relief only if he can demonstrate that the failure to instruct on the lesser-included offense violated due process.  He cannot meet this high burden.  There was a great deal of evidence that Oliver committed lewd acts on the 14-year-old victim, whom he kidnapped, which increased the risk of harm to her.  He had sex with the underage victim and forced her to work as a prostitute.   The state court denial of this claim was not unreasonable and the clam is denied.

## II.        SUFFICIENCY OF THE EVIDENCE

Oliver next contends that there was insufficient evidence to support the finding of a continuous aggravated kidnapping to support the lewd conduct counts because the victim had the opportunity to leave after the initial kidnapping.

### Legal Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id*. at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062, 2064 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1993). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

**Discussion**

The California Court of Appeal denied this claim:

> Appellant contends that even if the evidence shows he kidnapped Doe when he placed her in his car on San Pablo Avenue in Oakland, the evidence was insufficient to show the kidnapping continued throughout the period in which the lewd and lascivious acts occurred. We disagree.
>
> . . .
>
> The jury convicted appellant of seven counts of lewd and lascivious acts against Doe in violation of section 288, subdivision (a). For each count, the jury found true the allegation under section 667.61, subdivision (d)(2), that appellant "kidnap[ped] the victim . . . and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the commission of that offense. . . ." "The plain wording of this enhancement requires two elements: (1) a simple kidnapping (§ 207, subd. (a)); and (2) a substantial increase in the risk of harm to the victim." (*People v. Diaz* (2000) 78 Cal. App. 4th 243, 246, fn. omitted.)

United States District Court
Northern District of California

Section 207, subdivision (a), defines simple kidnapping: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."  The forcible detention of a victim is an element of kidnapping; "therefore, as long as the detention continues, the crime continues." (*Parnell v. Superior Court* (1981) 119 Cal. App. 3d 392, 407–408 (Parnell ); *see also People v. Thomas* (1994) 26 Cal. App. 4th 1328, 1334, *People v. Masten* (1982) 137 Cal. App. 3d 579, 588, *disapproved of on different grounds by People v. Jones* (1988) 46 Cal. 3d 585, 592, fn. 4.)

In *Parnell*, the defendant kidnapped seven-year-old Steven S. in 1972 and sexually abused him.  (*Parnell*, *supra*, 119 Cal. App. 3d 392, 398.)  The defendant changed Steven's name, enrolled him in school, and told him he had gone to court and obtained custody of him.  (*Id*. at p. 398.)  Steven was often cared for by babysitters and was also "outside [the defendant's] control" while in school and while the defendant was at work.  (*Id*. at p. 399.)  He also periodically stayed overnight at friends' houses, traveled out of town with his football team, went to the movies, had access to bicycles, made phone calls to his friends, mailed letters without the defendant's knowledge, and was in police custody for a brief time when he was caught shoplifting.  (*Ibid*.)  Despite the new life and identity the defendant had created for him, Steven never forgot his parents or his true identity, and testified at trial that he knew at all times the defendant "had [him] improperly."  (*Ibid*.)  Finally, in 1980, when Steven learned that the defendant had abducted another little boy, he left the defendant's home with the boy while the defendant was at work, coached the boy how to enter the police station to turn himself in, then walked away.  (*Id*. at pp. 399–400.)  When the boy became scared and ran after Steven, the police brought both boys back to the station.  (*Id*. at p. 400.)  After some coaxing, Steven identified the defendant as his abductor.  (*Ibid*.)

The defendant, who was charged with kidnapping and other crimes, moved to set aside the information asserting, among other things, that the statute of limitations had expired on his 1972 kidnapping of Steven.  (*Parnell*, *supra*, 119 Cal. App. 3d at pp. 401, 405–406.)  The Court of Appeal upheld the trial court's denial of the motion, holding the kidnapping was a continuing offense that did not end until the detention ended.  (*Id*. at pp. 407–409.)  The court held that while Steven "enjoyed considerable freedom of movement and association," it was not "unreasonable to infer that the boy, who had been subjected to continual sexual abuse and taken far from his home and family, remained with [the defendant] out of fear."  (*Id*. at p. 409.)

Although there are factual dissimilarities between Parnell and the present case, the same principles apply.  Appellant argues that any kidnapping that occurred when he placed Doe in his car "concluded" when "appellant discussed Doe working for him" and "Doe was returned to the street."  In his view, everything that occurred after that was Doe's choice.  He argues that because the detention ended

1   when he put Doe to work on the streets, the lewd and lascivious acts
2   he performed on her did not occur during the kidnapping.  Appellant
    makes much of Doe's apparent willingness to stay with the group,
3   particularly on the night he was arrested in San Jose, when Doe gave
    a false name and birth date to police so that she would not be
4   required to go home.  Doe, however, testified that after appellant
    forcibly placed her in his car and took her cell phone, she felt she
5   could not do anything and that he would find her if she left.  She
    also testified that she was frightened after appellant threatened her
6   with a belt, and after she heard he had beat "his other girl" with a
    belt when she refused to do as instructed.  Appellant also took all the
    money she made and made her dependent on him for her survival
7   by, among other things, buying all of her clothes and food, thereby
    making her particularly vulnerable to his assertion of authority.

8   Moreover, there was evidence that Doe was a "daddy's girl" who
    felt there was nothing left for her at home after her father left the
9   family.  Appellant, who initially used what Saleda described as
    "guerilla pimp" tactics by sending Doe to a break house and scaring
10  her, later used "Romeo pimp" tactics by using Doe's family
    background to his advantage by surrounding her with other girls
11  who befriended her, giving her marijuana and alcohol so she would
    be more comfortable, and making her feel like she was part of a
12  family.  Under the circumstances confronting Doe—a thirteen year
    old runaway who was scared to go home and afraid appellant would
13  find her if she left—the jury could reasonably find that she was not
    free and that the kidnapping did not end until she was taken into
14  custody on March 18.  Accordingly, there was substantial evidence
    supporting the jury's finding that Doe was kidnapped at the time the
15  lewd and lascivious acts oc[c]urred.

16  *Oliver*, 2014 WL 1270308, at *6-7.

17      Oliver's argument that the kidnapping had ended when the lewd conduct occurred was

18  rejected by the state court.  To the extent Oliver argues that the state court was incorrect in its

19  analysis of state law, he is not entitled to habeas relief.  The *Jackson* standard must be applied with

20  reference to the substantive elements of the criminal offense as defined by state law.  *Jackson*, 443

21  U.S. at 324 n.16; *see*, *e.g.*, *Boyer v. Belleque*, 659 F.3d 957, 968 (9th Cir. 2011) (concluding it was

22  not unreasonable, in light of Oregon case law, for Oregon court to conclude that a rational jury

23  could find beyond a reasonable doubt that petitioner intended to kill his victim based on proof that

24  he anally penetrated several victims with knowledge that he could infect them with AIDS).  The

25  state court's ruling on the state law issue is binding on this Court.

26      The "minimum amount of evidence that the Due Process Clause requires to prove the

27  offense is purely a matter of federal law," *Coleman*, 132 S. Ct. at 2064, and, Oliver has not shown

28  that the state court was objectively unreasonable in finding sufficient evidence to support the

United States District Court
Northern District of California

14

1   conviction in light of the high bar for *Jackson* claims.  There was sufficient evidence that the

2   victim remained with Oliver out of fear, even though she had opportunities to escape.  She was 13

3   years old, had been forcibly put into the car, her cell phone had been taken, and she believed that

4   Oliver would find her if she left.  The victim had been threatened with a belt, had almost

5   immediately been forced to commit sex acts after being kidnapped, and because Oliver took all of

6   her money, she was dependent on him.  Viewing all of this evidence in the light most favorable to

7   the prosecution, the jury could have found the essential elements of the crimes beyond a

8   reasonable doubt.  Oliver has failed to meet the high threshold of a sufficiency of the evidence

9   claim and he is not entitled to habeas relief.

10  **III.      CONTINUING DETENTION JURY INSTRUCTION**

11          Oliver contends that the trial court failed to properly instruct the jury regarding the

12  continuing period of detention with respect to how long the kidnapping lasted.  Oliver asserts that

13  because the prosecution argued that the kidnapping lasted from when the victim was placed into

14  the car until she was taken into police custody, the trial court should have instructed the jury on

15  the phrase, "continuing period of detention."

16          **Legal Standard**

17          A challenge to a jury instruction solely as an error under state law is not cognizable in

18  federal habeas corpus proceedings.  *Estelle*, 502 U.S. at 71-72.  Federal habeas relief is available

19  for instructional error only if the error "so infected the entire trial that the resulting conviction

20  violate[d] due process."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  Petitioner must show

21  that there is a "reasonable likelihood" that the jury misapplied the instruction.  *Estelle*, 502 U.S. at

22  72.  "It is well established that the instruction 'may not be judged in artificial isolation,' but must

23  be considered in the context of the instructions as a whole and the trial record."  *Id.*  A

24  determination that there is a reasonable likelihood that the jury has applied the challenged

25  instruction in a way that violates the Constitution establishes only that an error has occurred.

26  *Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, the court also must

27  determine that the error had a substantial and injurious influence in determining the jury's verdict,

28  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.

1    *Calderon*, 525 U.S. at 146-47.

2       The omission of an instruction is less likely to be prejudicial than a misstatement of the

3 law.  *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431

4 U.S. at 155).  Thus, a habeas petitioner whose claim involves a failure to give a particular

5 instruction bears an "'especially heavy burden.'"  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th

6 Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).  The significance of the omission of such an

7 instruction may be evaluated by comparison with the instructions that were given.  *Murtishaw v.*

8 *Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Henderso*n at 156); *see id*. at 972 (due

9 process violation found in capital case where petitioner demonstrated that application of the wrong

10 statute at his sentencing infected the proceeding with the jury's potential confusion regarding its

11 discretion to impose a life or death sentence).

12    **Discussion**

13       The California Court of Appeal denied this claim:

14         """"It is settled that in criminal cases, even in the absence of a
request, the trial court must instruct on the general principles of law
15 relevant to the issues raised by the evidence.  [Citations.]   The
general principles of law governing the case are those principles
16 closely and openly connected with the facts before the court, and
which are necessary for the jury's understanding of the case."
17 [Citation.]'"  (*People v. Middleton* (1997) 52 Cal. App. 4th 19, 30,
*disapproved on other grounds in People v. Gonzalez* (2003) 31 Cal.
18 4th 745, 752–753, fn. 3.)   "The language of a statute defining a
crime or defense is generally an appropriate and desirable basis for
19 an instruction, and is ordinarily sufficient when the defendant fails
to request amplification."  (*People v. Poggi* (1988) 45 Cal. 3d 306,
20 327.)

21         Here, the trial court properly instructed the jury with the elements of
the enhancement under section 667.61, subdivision (d)(2), when it
22 instructed the jury with CALCRIM No. 3175.7  Because CALCRIM
No. 3175 correctly states the law, the court satisfied its duty of
23 instructing the jury on the general principles of the law that applied
in the case.  Appellant asserts the court had a sua sponte duty to go
24 beyond CALCRIM No. 3175 and provide an instruction regarding
"continuous period of detention."   However, such an instruction
25 would have been a "pinpoint instruction," which is an instruction
that "'relate[s] particular facts to a legal issue in the case or
26 "pinpoint" the crux of a defendant's case, such as mistaken
identification or alibi,'" and which a court is not required to give
27 unless it is requested, and unless there is "'evidence supportive of
the theory.'"  (*People v. Gutierrez* (2009) 45 Cal. 4th 789, 824,
28 quoting *People v. Saille* (1991) 54 Cal. 3d 1103, 1119.)  If appellant

wanted a pinpoint instruction, it was his burden to request it from the trial court.  (*People v. Gutierrez,supra*, 45 Cal. 4th at p. 824.)  He cannot raise the issue for the first time in this court.

In any event, even assuming he had made a request, we would conclude the trial court was not required to provide the pinpoint instruction.  Appellant provides us with no authority for his position that an instruction regarding the phrase "continuing period of detention" was required, and does not propose the language of the instruction he claims the trial court was required to give.  Instead, he draws the phrase from language in cases such as *People v. Parnell*, *supra*, 119 Cal. App. 3d at pages 407–410 and *People v. Thomas*, *supra*, 26 Cal. App. 4th at page 1334, in which the court used the term to describe what had occurred.  "Language in an appellate court opinion which may be a good statement of law or of the reasoning of the appellate court does not necessarily make a good jury instruction."  (*People v. Adams* (1987) 196 Cal. App. 3d 201, 204–205; *see also People v. Colantuono* (1994) 7 Cal. 4th 206, 221, fn. 13.)  The fact that appellate courts have discussed the concept of "continuing period of detention" does not mean the trial court was required to give it in a jury instruction in this case.

Appellant nevertheless asserts the court should have provided further instruction because the jury, which submitted several questions during deliberations, must not have understood the phrase.  He argues, for example, that the jury's question-"can substantial distance be measured from a single point for all counts or from each individual occur[re]nce or count?"-shows it was confused as to the meaning of continuing period of detention.  The question, however, addressed the movement requirement of the enhancement under section 667.1, subdivision (d)(2).  In essence, the jury was asking whether each count required a new movement of the victim, or whether a single movement could suffice for all counts.  This question does not mean, as appellant asserts, that the jury had doubts as to Doe's continuing detention.  Rather, it showed the jury believed that appellant and Doe may not have always moved to a new location prior to each lewd act.  The court adequately responded to this question by stating, "Depending on the facts as you find them to be, the substantial distance for kidnapping can be one continuous act from the initial event on March 3, 2010 to the concluding sex act with the defendant, on or about March 18, 2010 or it could be measured by each incident, or combination thereof. [¶] To find the kidnapping allegation to be true all jurors must agree that the defendant committed the same act or acts.  It is not necessary that the particular act agreed upon be stated in your verdict.  This instruction should be read in conjunction with all the other instructions which are applicable to the facts as you have found them to be."  Appellant does not assert that this was an incorrect statement of the law, and we conclude it was appropriate.  Read in conjunction with CALCRIM No. 3175, the jury would have understood that while the movement for purposes of finding that appellant kidnapped Doe could be one continuous act, the lewd and lascivious acts had to occur during any kidnapping for the enhancement to apply.  There was no error.

*Oliver*, 2014 WL 1270308, at *7-9 (footnotes omitted).

1    Respondent argues that Oliver procedurally defaulted this claim because he failed to

2 contemporaneously object and request his proposed instruction at trial.  A federal court will not

3 review questions of federal law decided by a state court if the decision also rests on a state law

4 ground that is independent of the federal question and adequate to support the judgment.  *Coleman*

5 *v. Thompson*, 501 U.S. 722, 729-30 (1991).  The Ninth Circuit has recognized and applied the

6 California contemporaneous objection rule in affirming the denial of a federal petition on grounds

7 of procedural default where there was a complete failure to object at trial.  *See Inthavong v.*

8 *Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th

9 Cir. 2004).  In cases in which a state prisoner has defaulted his federal claims in state court,

10 federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the

11 default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that

12 failure to consider the claims will result in a fundamental miscarriage of justice.  *Coleman*, 501

13 U.S. at 750.  Oliver has not responded to the procedural default argument and the record suggests

14 procedural default, but the Court will nevertheless look to the merits of the claim.

15    The California Court of Appeal held that even if Oliver had requested the instruction and

16 the trial court denied the request, there was no error.  The California Court of Appeal found that

17 the trial court properly instructed the jury on the principles of law that applied in the case and the

18 elements of each enhancement were properly explained.  Oliver is not entitled to habeas relief for

19 his argument that the state court misapplied state law.  Moreover, Oliver provided no sample of

20 the jury instruction that he argues should have been provided; instead, he cites to discussions in

21 court opinions.  The state court noted that "[l]anguage in an appellate court opinion which may be

22 a good statement of law or of the reasoning of the appellate court does not necessarily make a

23 good jury instruction."  *People v. Middleton*, 52 Cal. App. 4th 19, 30 (1997), *disapproved on other*

24 *grounds*.

25    Oliver has failed to show that the court's failure to give an instruction on the phrase

26 "continuing period of detention" had a substantial and injurious influence on the verdict in this

27 case.  The jury was properly instructed, and the state court found that the jury questions did not

28 require further instructions and that the trial court responded appropriately to the jury's questions.

1    The state court's determination was not objectively unreasonable, and Oliver has not met the

2    especially heavy burden of showing error for court's the failure to give an instruction.  He is not

3    entitled to relief, and this claim is denied.

4  **IV.**        **CONSENT JURY INSTRUCTION**

5      Oliver argues that the trial court erred by failing to sua sponte instruct regarding "consent

6    given" and "good faith belief in consent" and that the trial court's answers to jury questions about

7    consent diluted the prosecution's burden of proof.

8      **Discussion**

9      Oliver was found guilty of committing lewd acts on a child under 14 during an aggravated

10   kidnapping in violation of Cal. Penal Code sections 288(a) and 667.61(d)(2).  Section 667.61(d)(2)

11   outlines the punishment when, "[t]he defendant kidnapped the victim of the present offense and

12   the movement of the victim substantially increased the risk of harm to the victim over and above

13   that level of risk necessarily inherent in the underlying offense . . ."

14      The jury was instructed with CALCRIM 3175 regarding section 667.61(d)(2) which stated,

15   "the People must prove that . . . . 4) Jane Doe did not consent to the movement; and 5) the

16   defendant did not actually and reasonably believe that Jane Doe consented to the movement . . . .

17   The People have the burden of proving each allegation beyond a reasonable doubt.  If the People

18   have not met this burden, you must find that the allegation has not been proved."  CT at 656.

19   Oliver contends that the trial court should have sua sponte instructed the jury with CALCRIM

20   1215 in response to several questions from the jury.

21      The California Court of Appeal discussed the background and denied this claim:

22        CALCRIM No. 1215 provides: "Defense: Consent Given [¶] The
defendant is not guilty of kidnapping if the other person consented

23        to go with the defendant.  The other person consented if (he/she) (1)
freely and voluntarily agreed to go with or be moved by the

24        defendant, (2) was aware of the movement, and (3) had sufficient
maturity and understanding to choose to go with the defendant.  The

25        People have the burden of proving beyond a reasonable doubt that the
other person did not consent to go with the defendant.  If the

26        People have not met this burden, you must find the defendant not
guilty of this crime."  It also provides: "Defense: Good Faith Belief

27        in Consent [¶] [The defendant is not guilty of kidnapping if (he/she)
reasonably and actually believed that the other person consented to

28        the movement.  The People have the burden of proving beyond a

reasonable doubt that the defendant did not reasonably and actually believe that the other person consented to the movement.  If the People have not met this burden, you must find the defendant not guilty of this crime.]"

Here, the trial court-while not using the language provided in CALCRIM No. 1215-did define the terms "consent" and the defendant's "belief as to consent."  First, in response to the jury's question regarding whether Doe had the legal capacity as a minor to consent, the trial court stated, "And just to refresh your recollection that's the instruction that deals with kidnapping as an allegation which is part of the charges here.  And Item No. 4 and No. 5 enumerated the things that the People must prove including that Jane Doe did not consent to the movement. [¶] The answer is, yes, she can consent but it must be considered in light of the following context: [¶] To consent to an act or transaction a person must, one, act freely and voluntarily and not under the influence of threats, force or duress; two, have knowledge of the true nature of the act or transaction involved; and three, possess sufficient mental capacity to make an intelligent choice whether to do or not to do something proposed by another person.   In deciding whether Jane Doe consented to the movement, you should consider the totality of the circumstances surrounding the event and Jane Doe's age."  Defense counsel agreed with this response prior to the trial court reading it to the jury.

Second, the jury asked the following question: "'The defendant did not actually and reasonably believe that Jane Doe consented to the movement.'  Must he believe that Jane Doe consented in the same way the court defined consent in response to [the prior question regarding consent?]"  The trial court responded, "And I went back to your earlier question that brought about the Court's instruction to you on consent.  And that question focused on Jane Doe.  Basically it asked: As a minor at age 13, does she legally have the ability to consent to movement?  And so that definition, in that context, was really directed towards whether or not a 13 and under, what circumstances and what you should consider.  So my short answer to your question is does that definition apply to the defendant?  And the answer is the best definition of what is supposed to be considered is what is set forth in the language.   Because we're dealing with different contextual settings.  And the language here is the defendant did not actually and reasonably believe that Jane Doe consented to the movement.  It means just that.  Under the totality of the circumstances, is it reasonable for the defendant to believe that Jane Doe was consenting to the movement, whatever it is.  And I don't necessarily have any further definition than that and I apologize if it doesn't really help.  Hopefully, it does.  Just given the plain language of the words.  It's normal interpretation.  And take a look at it.  Is it reasonable that the defendant believed that she was consenting to movement given the totality of the circumstances.  And there's a lot of circumstances there for you to consider."  Defense counsel did not object to this response.

Appellant does not contend that the trial court's definition of "consent" or "belief as to consent" was wrong.  Instead, he asserts the court should have used CALCRIM No. 1215 instead of using its

own language to respond to the jury's questions because when he told the jury to consider the terms "consent" and "belief as to consent" under "the totality of the circumstances," thereby "replac[ing] reasonable doubt with totality of the circumstances." He argues, "The 'totality of the circumstances' is not the same as 'beyond reasonable doubt,' and indeed diluted the standard of proof."

We disagree that the trial court's responses to the jury's questions "diluted the standard of proof." Rather, the court was explaining to the jury that in evaluating both Doe's consent and appellant's good faith belief as to her consent, it should consider all of the evidence relevant to those issues, rather than a single factor—such as Doe's age—in isolation. The court did not use the term "totality of the circumstances" in manner related to the burden of proof. Further, the jury had been instructed separately and repeatedly that the People had the burden to prove every element beyond a reasonable doubt, including the two elements for which consent was an issue, and the trial court instructed the jury with CALCRIM No. 220 – Reasonable Doubt, which stated in part, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." Defining the terms relating to consent did not obligate the court to reinstruct the jury on the burden of proof. We presume a jury is capable of understanding and correlating all jury instructions that are given. (*People v. Yoder* (1979) 100 Cal.App.3 d 333, 338.) We have no reason to believe the jury was unable to do so in this case.

*Oliver*, 2014 WL 1270308, at 9-10 (footnote omitted).

Oliver does not argue that the trial court provided incorrect definitions of "consent" or "belief as to consent." He argues that the trial court should have used CALCRIM 1215 instead of the language that was used. The Court of Appeal's holding that the trial court's language was proper was not an unreasonable application of Supreme Court authority or an unreasonable determination of the facts. Oliver is not entitled to federal habeas relief for his allegation that the trial court used its own language instead of CALCRIM 1215.

The Court of Appeal was also not unreasonable in determining that the trial court's instructions were appropriate and did not dilute the standard of proof. The trial court used the phrase "totality of the circumstances" in instructing the jury on how to evaluate the victim's consent to go with Oliver and Oliver's good faith belief as to her consent. The trial court did not use "totality of the circumstances" in any way related to the burden of proof. The trial court repeatedly instructed the jury that the prosecution had to prove every element beyond a reasonable doubt. The trial court's instruction also stated that the prosecution had the burden of proving that

the victim did not consent.  This claim is denied.

## V.     CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated:  February 17, 2016

_____

JAMES DONATO
United States District Judge

United States District Court
Northern District of California

22

1

2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

3

4

5

6

7

8

HENRY OLIVER,

            Plaintiff,

     v.

C.E. DUCART,

            Defendant.

Case No.  15-cv-00397-JD

**CERTIFICATE OF SERVICE**

9

10

11

     I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

12

13

14

15

16

     That on February 17, 2016, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

17

18

19

Henry  Oliver ID: V-53030
Pelican Bay State Prison
P.O. Box 7500
Crescent City, CA 95532-7000

20

21

Dated: February 17, 2016

22

23

Susan Y. Soong
Clerk, United States District Court

24

25

26

27

By:

LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO

28

United States District Court
Northern District of California